[Civ. No. 4461. Second Appellate District, Division Two.—May 12, 1924.]

THE MOUNTAIN CLUB (a Corporation), Respondent, v. HARRY J. PINNEY, etc., Appellant.

[1] REFORMATION OF INSTRUMENTS—DEEDS—DESCRIPTION—QUIETING TITLE — MISTAKE — FINDING — EVIDENCE.—In this action for the reformation of a deed to correct a description of the land in-

---

1. Sufficiency of evidence to warrant reformation of instrument on ground of mutual mistake, note, 19 **Ann. Cas.** 343. See, also, 9 Cal. Jur. 379; 23 **R. C. L.** 367.

tended to be conveyed by the grantor and to be received by the grantee, and 'for a decree quieting title to the property conveyed by the deed as reformed, the evidence was sufficient to support the finding of the trial court that the parties to the deed were laboring under a mutual mistake in inserting in the deed the property description which it contained.

[2] Id.—Mistake—Innocent Purchaser.—An innocent purchaser of land for value without notice of a mutual mistake made by a former owner of the land and another grantee in describing the land in the deed is not affected by such mistake.

[3] Id.—Description—Mistake—Possession—Notice.—In such action, where defendant, who was relying only upon the record title, purchased the land in dispute, and the deed in question was made to plaintiff's predecessors, at a time when the records showed title to be in the government, and the original grantor occupied the land after his conveyance to the government, as likewise did plaintiff's predecessors and plaintiff itself after the conveyance by said original grantor to plaintiff's predecessors—these occupations being referable to the same mistake, the belief on the part of the original grantor that he had omitted from his deed to the government the land in dispute—it made no difference whether, as time rolled on for nearly twenty years, the possession of the property was that of the original grantor, that of his personal representatives, that of plaintiff's predecessors, or that of plaintiff itself, and no matter what persons were in possession among all these, their possession was in opposition to the record title, the world, including defendant, being put upon such notice during said period as the evidence of possession imparted, and being during the same period put upon corresponding inquiry.

[4] Id.—Change of Possession—Acts of Ownership—Evidence.—In such action, the contention of defendant, who claims to have been an innocent purchaser for value and without notice of the mistake sought to be corrected, that there was no striking evidence of change of possession of the land in dispute from the original grantor to plaintiff and its predecessors, must fall, where not only did a change of possession occur after the grant to plaintiff's predecessors, but plaintiff and its predecessors had also exercised a marked and notorious dominion over the property, unembarrassed by the presence of the original grantor for a single moment.

2. Right to reformation of description in deed as against purchaser without notice, note, Ann. Cas. 1918D, 147. See, also, 23 R. C. L. 339.

3. See 1 Cal. Jur. 560; 1 R. C. L. 717.

4. See 1 Cal. Jur. 549; 1 R. C. L. 716.

[5] ID.—NOTICE—POSSESSION.—The nature of the possession of real property which will operate to impart notice to the world, and, therefore, to a purchaser for value who claims to rely upon the record title, is that the possession must be open, visible, unambiguous, exclusive, uninterrupted and notorious, and that it must indicate the occupant.

[6] ID.—PURCHASER WITHOUT NOTICE—FINDING—EVIDENCE.—In such action, the evidence was sufficient to support the finding of the trial court to the effect that defendant was not a purchaser without notice.

[7] ID.—LACHES—EVIDENCE.—In such action, plaintiff was not guilty of laches in the commencement of said action.

[8] ID.—ESTOPPEL.—In such action, plaintiff was not estopped to claim against defendant the relief which was awarded by the trial court.

[9] ID.—ADVERSE POSSESSION—SUBSTANTIAL INCLOSURE—FINDING—EVIDENCE.—In such action, the evidence was sufficient to support the finding of the trial court that the land in dispute was protected by a substantial inclosure. (On petition for hearing in supreme court, approval withheld.)

[10] ID.—CULTIVATION AND IMPROVEMENT OF LAND—FINDING—EVIDENCE.—In such action, the finding that the land in dispute was shown to have been "usually cultivated or improved" during the period covered by such finding was supported by the evidence. (On petition for hearing in supreme court, approval withheld.)

[11] ID.—PAYMENT OF TAXES—EVIDENCE.—In such action, defendant's contention that the finding as to adverse possession is not supported by the evidence because the record fails to show that plaintiff complied with the provisions of the statute concerning the payment of taxes, cannot be sustained. (On petition for hearing in supreme court, approval withheld.)

---

(1) 34 Cyc., p. 988.   (2) 39 Cyc., p. 1775.   (3) 2 C. J., p. 1744.
(4) 39 Cyc., p. 1785.   (5) 39 Cyc., pp. 1748, 1749, 1752.   (6) 39 Cyc., p. 1785.   (7) 34 Cyc., p. 966.   (8) 34 Cyc., p. 943.   (9) 2 C. J., p. 62, sec. 15, p. 276, sec. 621.   (10) 2 C. J., p. 276, sec. 621. (11) 2 C. J., p. 276, sec. 621.

5. Adverse possession due to ignorance or mistake as to boundary, notes, 24 Am. St. Rep. 388; 15 Ann. Cas. 827; Ann. Cas. 1912A, 450; 21 L. R. A. 829; 33 L. R. A. (N. S.) 923. See, also, 1 Cal. Jur. 578; 1 R. C. L. 732.

9. Inclosure of land as essential to adverse possession, note, Ann. Cas. 1913A, 750. See, also, 1 Cal. Jur. 530; 1 R. C. L. 698.

10. See 1 Cal. Jur. 529; 1 R. C. L. 697.

11. See 1 Cal. Jur. 562; 1 R. C. L. 699.

APPEAL from a judgment of the Superior Court of San Bernardino County. Rex B. Goodcell, Judge. Affirmed.

The facts are stated in the opinion of the court.

Ticknor, Carter & Webster for Appellant.

Leonard, Surr & Hellyer for Respondent.

WORKS, J.—This action concerns a certain parcel of real property in the San Bernardino Mountains, to which we shall in this opinion refer as lot 5. The complaint is in two counts. The first of these alleges the execution of a certain deed to plaintiff's predecessors by one Schneider and pleads with great particularity facts constituting a cause of action upon the ground of mistake, the alleged mistake consisting of the insertion in the deed of a property description which is not a description of the land intended to be conveyed by the grantor and to be received by the grantee. The second count is a complaint to quiet title in the ordinary form. The prayer is for a reformation of the deed and other documents and for a decree quieting title to the property conveyed by the deed as reformed. The trial court found for plaintiff upon both counts of the complaint and rendered judgment accordingly. Defendant appeals.

[1] The first point made by appellant is that the evidence in the record is insufficient to support the finding of the trial court that the parties to the deed were laboring under a mutual mistake in inserting in the instrument the property description which it contained, and a consideration of the question presented requires a statement of various portions of the evidence, material not alone to the point itself, but to others which will be examined later. Schneider, before the execution of the deed in question, was the owner also of a certain lot 8, which lay immediately to the south of lot 5. Each of the lots, it is to be understood, was so designated and numbered upon the government plats and according to government surveys, and they were taken up by Schneider and patented to him as government lands. The two lots together contain 101.24 acres, and 50.82 acres of this area lie in lot 5. Some years prior to the execution of the deed in question here, Schneider, desiring to take up

other government lands in lieu of a part of his holdings,
executed to the government his deed attempting to convey
the south thirty acres of lot 5 and all of lot 8. This deed was
executed in 1901 and was recorded in the county recorder's
office in the same year. It was, however, never accepted by
the government, although nothing appeared of record in-
dicating that fact until the year 1920, when a disclaimer by
the government was placed of record. It is to be observed
here, for it is an important point in the litigation, that be-
yond a doubt, Schneider believed that his deed to the gov-
ernment, conceding that it was to become effective, left him
as the owner, in lots 5 and 8, of only the north 20.82 acres
of the former. That acreage, however, is unfit for cultiva-
tion and for human habitation, being rugged and mountain-
ous, and Schneider, for a long time before he executed the
deed to the government, had lived in a log house on the
south thirty acres of lot 5. Not only so, but he resided
there for a long time thereafter, possibly, in fact, until a
short time after the making of the deed to respondent's
predecessors which is in question here. During a period
commencing prior to the deed to the government and run-
ning until the date of the deed to respondent's predecessors
Schneider cultivated and maintained in the neighborhood of
the house an apple orchard and a small alfalfa field. All
of his improvements were surrounded by what we shall for
the present term an inclosure, leaving the real nature of
the structure so-called to be discussed later. The ground
thus surrounded was irregular in shape, but was so con-
formed as to have what may be termed its northerly, east-
erly, southerly and westerly sides. It was all within the
boundaries of the south thirty acres of lot 5. To this in-
closure, together with all that it contained, we shall here-
after refer as the Schneider homestead. The northerly side
of the homestead was at or about the foot of the rise which
extended northward into the north 20.82 acres of the lot,
while its southerly side was bounded by the northerly bank
of the Santa Ana River. This stream meanders across the
south thirty acres of lot 5 in a course which, at least where
it passes the Schneider homestead, is not greatly divergent
from the rectilinear, and which runs westerly, but with a
southerly trend. Although Schneider understood that his
deed to the government left him as the record owner of the

north 20.82 acres of lot 5, it is certain that he believed that the homestead lay within that acreage. A forest ranger in the employ of the government testified thus concerning a conversation he had with Schneider about the year 1907: "We were standing in front of his ranch house there, near the creek, and he pointed to me across the creek about fifty or sixty feet and he said, 'I have traded to the government all of the land except this piece that we are on; I have reserved the place where the apples and orchard and alfalfa patch were'—and where his houses were." Not only is this testimony in the record, but the situation is apparent without it. There was no reason whatever for Schneider having retained the worthless mountainous land which actually lay within the limits of the 20.82 acres. There was every reason for his retaining the only land of value in his entire holding, the land which he had cultivated, upon which he had built and upon which he had dwelt. It is perfectly evident, if we may express the idea of lineal extent in terms relating to surface, that he believed that his entire property lay 20.82 acres south of its actual location under the government surveys.

Leaving these basic features of the evidence bearing upon the question of mistake, we come now to a mention of those portions of the record which disclose the negotiations leading up to the execution of the deed from Schneider to respondent's predecessors. Respondent was organized for the purpose of providing a summer hunting and fishing location for its members, consisting, during the history of the organization, of from five to twelve men. One Cave, a member of the club, entered into negotiations with Schneider for the purchase of a site convenient for the purposes of himself and the other members. This was in the year 1907. Cave testified that his first conversation with Schneider was on the premises at the homestead. He says: "I asked him where the land laid, and he designated the east line about where his fence was, the west line where his fence was, and the south line the Santa Ana River, and the north line taking in all the tillable land up to the hill, and it covered all the land under cultivation and under fence." One De Hart, also a member of respondent, was present at the conversation between Cave and Schneider. De Hart testified: "Schneider said that he had turned back part of his land for scrip to the

government, and that all he had retained was what he lived on. . . . He said there was perhaps sixty or forty acres of land that he had retained, and that this part where he lived was all that was any account anyhow of the land." One Allen, a lawyer, was employed by the members of respondent for the purpose of formulating an agreement for the purchase of Schneider's property. He and Schneider had a conversation concerning the proposed transfer. Upon being asked what Schneider said "respecting the property that he proposed or intended to describe in this agreement," Allen testified, "He said that he wished to convey all the property that he owned in Santa Ana Canyon, in San Bernardino County." According to Allen, further, Schneider told him that "he had no papers showing his title." Allen then got from a title company a description of the property apparently intended to be conveyed and inserted it in the agreement. The same description was incorporated in the deed later executed by Schneider to the members of respondent, who were its predecessors in interest. The property thus described is the north 20.82 acres of lot 5. The mistake of which respondent's first cause of action is predicated, and which was found by the trial court to exist, is the alleged mistake in reproducing in the deed this description of a mountainous tract of land instead of a description of the Schneider homestead.

It is vigorously contended by appellant that neither Schneider nor the members of respondent could have been laboring under such a mistake. It is pointed out that the description actually inserted in the deed calls for a tract inclosed within right lines, and, especially, that it calls for a southern boundary consisting of a right east and west line. In contrast with these indubitably correct assertions, we are reminded that the inclosure surrounding the Schneider homestead was irregular and was meandering in part, and, particularly, that the southerly line of that inclosure, marked by the banks of the river, is not straight and that it departs from a true east and west direction. We are convinced not only that these circumstances did not require the trial court to find that there was no mistake, but that they are not even inconsistent with the parts of the record, either referred to or quoted above, from which the inference that there was a mistake could readily be drawn, if, indeed, that inference

were not necessarily to be drawn therefrom. It was, of course, apparent to the members of respondent that the homestead, as pointed out to them by Schneider, was not inclosed within right lines, but there is nothing in the record as noted up to this point which is inconsistent with the idea that they believed they were buying and Schneider believed he was selling a larger tract the exterior boundaries of which were outside the inclosure surrounding the homestead and of which the latter was but a part. In truth, certain portions of the record which we have reserved for present mention show affirmatively that the idea just expressed was in the minds of all the parties to the negotiations. Upon this point we refer to a part of Cave's testimony: "Q. He [Schneider] wasn't exactly certain as to the north boundary? A. Well, he didn't tell me anything about any corner; he said it ran back on the hill. It ran far enough north to take in all his tillable land. Q. He didn't tell you it stopped with the tillable land? He gave you to understand it took in the tillable land and might take in even more? A. Yes; that was the idea I got. . . . Q. Was the entire 20.82 acres approximately all practically in cultivation? A. No. Q. And what portion of it would you say was in cultivation? A. In orchard and alfalfa I should say approximately six acres. . . . Q. And the rest of it you feel was susceptible of cultivation? A. No; the rest of it was in river wash and in the hills on the north." As an answer to one of a series of questions concerning the lines of the inclosure round the Schneider homestead, the particular question relating to the northern boundary, Cave testified: "I was not particularly interested in the line as long as it covered all the land of any value. As long as it went back in the hills, I didn't care how far." A further examination proceeded: "Q. How far, as long as it didn't stop short of that land you designate as tillable land? A. That is all I was concerned with. Q. You at that time made no effort to find out the exact location. A. No, sir. Q. And made no survey? A. Made no survey. . . . Q. At the time you talked with Mr. Schneider, . . . was there anything said about the number of acres embraced in this tract? A. I don't remember that there was. I think the first knowledge we had of the acreage was when we got the search from the record." It is to be observed that the testimony of De Hart, already quoted, bears directly upon

the particular question now under discussion, and he further testified even more explicitly on the point. He said: "[Schneider] led me to believe that the property we were supposed to purchase was the land that the apple grove and the alfalfa patch—in fact all of the land that was under the fence, and running over on the other side of the river, on the south side of the river; in other words; and all of the land which was up on the hill, and the buckthorn which he could not penetrate at all—that is unless you cut your way in." Taking all the testimony together, the fact that the property actually described in the deed is bounded by right lines does not show that the alleged mistake did not occur. There is in the record, it is true, some slight evidence tending to indicate that the members of respondent believed that Schneider, in pointing out the inclosure surrounding the homestead, was showing them the exterior boundaries of the entire property about to be conveyed, but the portions of the testimony to which we have referred more than justified the trial court in adopting the view that they believed, and that Schneider believed and intended them to believe, that the homestead was but a part of the entire property still owned by him. If we consider specially the point most strongly urged by appellant that the act of Schneider in pointing to the river bank as his southern boundary could not have deceived the members of respondent, for the reason that the deed showed that boundary to be a right line, we are prompted to observe that the location of the river was such that they might reasonably have understood that Schneider was pointing to a natural boundary which he had employed on the ground roughly to approximate the southern conventional boundary of his land. We remark this, of course, in addition to what we have already said upon the point to which we now address ourselves. On the whole, we are satisfied that the finding as to mistake is supported by the evidence.

A treatment of the next question presented by appellant requires an additional statement of facts. Schneider died in 1911. It was first shown of record in 1920, as we have already observed, that his deed attempting to convey lot 8 and the south thirty acres of lot 5 to the government had been rejected. With this showing it at once appeared of record that the estate of Schneider was the owner of the two lots in

their entirety, with the exception of the north 20.82 acres of lot 5, title to which appeared of record in respondent. Already, however, in 1919, the public administrator of San Bernardino County had taken out letters of administration upon the estate and such proceedings were had in the probate court that appellant, Pinney, purchased at an administrator's sale, for a valuable consideration, in 1920, all of the real property standing of record in Schneider's name. After this event the present action was commenced. We are now brought to the second point made by appellant. He contends that he is an innocent purchaser for value without notice and that, as such, he is neither affected nor bound by any mistake which Schneider and the members of respondent may have made in inserting the description in the deed executed by him to them. **[2]** It is a well-established rule of law, carried into the code in this state, that an innocent purchaser for value without notice is not affected by a mistake such as the trial court found was made between Schneider and his grantees (Civ. Code, sec. 3399); but respondent insists that appellant is not a purchaser without notice and the trial court so found. We are thus presented with the real question to be determined by us upon the branch of the case now under consideration. The point made by respondent is that its possession of the Schneider homestead during a long period of time was such, when accompanied by the dominion it exercised over the property while in possession, that constructive notice that it claimed the premises was thereby conveyed to the world. In disposing of this contention we shall first deal with the facts upon which it is made and shall thereafter consider the authorities bearing upon the law of constructive notice under the facts disclosed. The deed from Schneider to the members of respondent was executed in August, 1907, and the grantees under that instrument in turn executed their deed to respondent in February, 1908. Under an arrangement incorporated in the agreement above mentioned and which preceded the first of these deeds, Schneider reserved the right to live on the homestead described, however, as was the case in all the instruments relating to the property, as the north 20.82 acres of lot 5. Schneider's right to occupy the premises was exercised for but a brief period, if at all, as the record shows that he was taken ill and that in August, 1907, the month in which he executed his deed

to the members of respondent, he was removed to a hospital in Redlands. He never again was upon the homestead.

It now becomes necessary, as a basis upon which to indicate the nature of the possession of respondent, and its acts connected therewith, to point out the character of the inclosure surrounding the homestead, together with other physical features of the place, at the time of the deed from Schneider to the members of respondent. The testimony on these questions relates to the occasion, already mentioned, upon which Cave, accompanied by De Hart, had his conversation with Schneider on the premises. Cave testified that the east and west boundaries were marked by fences consisting of some brush and some wire, the brush having been cut from the land and thrown up along the fence line; that the south line was the bank of the river, although there was a little piece of rock fence and some rail fence along the top of the bank, running in a meandering line near the edge; that the east fence contained brush and rails and poles which had been cut from along the river; that the west fence was of the same kind, some rail and some brush and some wire; that the north end of the east fence ran into the buckthorn brush at the bottom of the mountainside and that the same was true of the north end of the west fence; that the south end of the west fence ended at the river, where there was quite a bank and that along the bank, where it was necessary to keep cattle out, there had been brush piled and poles put across; and that the south end of the east fence did not come to the river bank, but that there was an old trail between the end of the fence and the bank. De Hart testified that there were several cabins and outhouses or smokehouses on the homestead; that the entire north boundary of the premises was marked by the growing buckthorn of the mountains, so dense that cattle would not go through it, except for a short distance at the east end, where there was a little wire; that the west fence was of wire and rail and that the south fence was wire and the river; that where the brush on the north was used as a boundary it was so thick that it would turn cattle; that the east fence was wire and partially rails or partially poles; that the fence was sufficient to protect the ranch, there being alfalfa in the barn at the time; and that the wire fence was composed of three strands.

Coming now to the possession and acts of respondent, made evident through the activities of its members, De Hart testified that his connection with the club was maintained for eight or ten years after 1907; that during the period of his membership the fences around the homestead were kept in repair; that the fence on all sides around the place was not continuous, but it was a fence that would turn cattle; that it was not continuous on the north side; that the irrigating ditch went along there; that during his membership an outshed or woodshed was torn down; that along a part of the way on the north side of the homestead no barrier existed except buckthorn brush, which was so thick that cattle would not go through it; that this buckthorn was the barrier along the entire north side except a short distance at the easterly end where a little wire was employed; that on the west side the members of the club put in wire all the way through the brush; that the property was entirely closed by these obstructions and fences, so much so that it kept the cattle out which were pastured on the ranch, and that there was a growing alfalfa patch there which would naturally invite them; that the alfalfa patch was maintained by the club for several years; that the obstructions and fences were maintained all the time he was a member, and that the stock driven in by members was kept pastured inside the inclosure; that for the first three or four years of his membership in the club he made frequent visits to the homestead during the summer, but that the other members made infrequent visits; that about September, 1907, or a little later, he put a new roof over the kitchen of one of the cabins and put in a new floor and that on the occasion when this work was done he remained on the homestead about six weeks with a Captain Cox, a carpenter employed by respondent; that during that time different members of the club were also there at times, including Cave and one Sucher and one Biggin, and that Biggin remained about two weeks, the others not so long; that De Hart was again at the place early in April, 1908, and remained perhaps a week, perhaps four or five days, for the opening of the fishing season; that he was there for occasional fishing trips and vacations during the summer of 1908 and that on those trips he saw other members of the club there and that they remained there for periods ranging from a day or two to a week or two; that during his membership in the club he

shouldn't say that the property was unoccupied the greater portion of the year, that it was then occupied more than half of each year, but that it was occupied more than it is now; that one year he was there continuously for about five months; that after three or four years he discontinued going to the homestead to the extent that he had been going, but that until his membership ended he went there a couple or three times in the spring or summer; that these were short trips, but that once during the season he perhaps stayed a week; that frequently when he went in during the first three or four years of his membership he would find the place unoccupied; that such was the general situation, but that he tried to go in when no one else was there; that members of the club went in to the homestead at times during the winter, whenever the roads were open, but that there was no continuous occupation during the winter; that the east fence twisted around on the north side until it got to the thick brush and from that on the brush was so thick that it turned the cattle; that the fence on the east side is now all wire, but Schneider had on that side partially rails or partially poles; that the bluff of the Santa Ana River at the south of the homestead is a bluff which is straight enough up and down—perhaps five or six feet—so that cattle could not come in there; that the fence is not a continuous fence, but it makes a continuous fence with the nature of the land; that the property was kept in better condition than it was by Schneider; that the club pruned the apple trees every three years, which was sufficient, but that Schneider didn't prune them at all; that the club had to keep a fence there that would keep stock out and keep the stock of the members in, and that the club did; that he was on the homestead three times after his membership ended; that the last time he was there was a year ago last fall (which was the fall of 1919, as the action was tried in June, 1921); that the property was in as good condition as when Schneider had it, and with the exception of the alfalfa patch it was in better condition; that he made no change in the physical appearance of the property in any way while he was a member of respondent other than to make the necessary repairs from time to time; that the club refenced the place, you might say; that there were three spools of wire that went in, outside of the wire that Schneider had there, and that the fence was supposed to have been made

cattle-tight; that it seemed to him that while he was a member of respondent the Santa Ana side of the fence was carried all the way along; that the apples from the orchard were harvested every year when they were not frozen and were sold; that the club planted some garden on the place; that at one time there was a hand-printed sign on the place which read "Private Property"; that it was at the gate at the east end where people would be coming in and that it was put up by members of respondent; that the letters on the sign were an inch and a half, perhaps larger; that the sign was a foot and a half long by a foot wide, the color of wood and with black letters; and that it was up during all the time that he was a member of the club, having been placed in 1907 or 1908. Biggin, the president of respondent and a member since its organization, testified that he first went to the Schneider homestead to make use of it as a member of respondent in the summer of 1908; that, starting in that year, he has spent thirty days on the property in each year; that he has taken his family there a great deal and that he has taken visitors or friends there with him; that he has been on the property many times each year, at various times during the year, running from May 1st to January 1st; that after January 1st that country is sometimes open and sometimes snowed in; that at the time he has been going to the property other members have been doing the same and that others have been there considerably at times when he was there; that, as an instance, two years ago Cave and certain of his relatives was there over Sunday and some of them remained three or four days afterward; that there were many such cases and that, as another instance, three years ago, beginning July 1st, Biggin's family and one of his office women spent two and a half months at the homestead, during which time he himself was there quite a good deal; that all the members of the club resorted to the property after it was acquired in 1907, some more than others; that while De Hart was a member he was on the place more than anyone else, but that since that time Biggin has been there most, and that Cave, who was deceased at the time of the trial, spent a lot of time there, whenever he could get there; that about five years ago Biggin and a friend of his took off the old roof and put on a new roof on the west cabin and cleaned up the trash; that he has built a good deal of fence in there, too, which was

necessary to keep stock out; that he didn't think that there was one fence post on the property which was there in 1907 and that he didn't think that any of the same wire was left; that the fences have always been kept in sufficient repair to keep the stock out and that where there was no fence there was a natural barrier; that fence was built along the entire river bank, but that part of it, along with part of the bank, was washed out by storms in 1916, and that the part of the fence thus destroyed was replaced by the club the next spring; that the stand of alfalfa which was on the property during Schneider's time was not kept up after 1916 for the reason that the flood of that year washed out the irrigating ditch; that the apple orchard was not plowed or harrowed by respondent, but that the trees were irrigated until 1916, when the ditch was washed out, and pruned five times after 1907; that he never penetrated north from the orchard to a line marked by a surveyor as the south line of the 20.82 acres on a map introduced in evidence and that the country there is impassable; that last fall there was a sign on an oak tree on the southeast corner of the homestead, which was the place of entrance to it; that the sign was placed by Biggin himself; that it has been on the tree most of the time during the possession of respondent and that it read "Private property—keep out"; that there was also a sign on the south side of the west cabin, near the entrance to it; that this sign had remained in place for five to seven years up to last fall, when it was still there; that he himself placed this sign and that it read: "Private property of Mountain Club—please keep out"; that this sign was about twelve inches by sixteen, with letters an inch and a half high; that there was also formerly on the premises a sign which was posted shortly after respondent took possession and which remained in place for ten years, but which was not in place after the expiration of that time; that this sign read "Private property, keep out"; that there was also a sign, made on about two and a half feet of a six-inch board, placed by the gateway where the members went to get water from the river; that this sign was put up by some member and read "Mountain Club"; that it was placed sometime within the last ten years, but that he couldn't tell how long it remained; that three of the five prunings of the apple trees occurred in winter; that for two months at a time, seven

or eight years ago, an employee of respondent pruned trees and cut wood on the homestead, living in a tent on the premises during the period; and that in the spring of 1920, soon after the probate sale to appellant, the homestead was furnished to the extent that it had been all along, that is, in the kitchen there was a range, table, sideboard, cupboard and sink, in the west room there were mattresses and covers for two beds, blankets and sheets and pillow-cases, and two large chests, one a tin and zinc-lined chest that contained the bedding. This complex array of testimony covers the main features of the evidence bearing upon the question whether notice of respondent's claim to the homestead was constructively conveyed to appellant, and we have stated it with a reasonable degree of fullness because it relates not alone to that point but as well to the question of respondent's alleged title by adverse possession, later to be considered.

[3] Disposition must be made of a specific point presented by appellant concerning the evidence just recited before we come to the general question of the effect of that evidence as imparting constructive notice to him. Appellant says that in order to produce the result which, according to respondent, flows from the testimony in the case, the showing of change of possession from Schneider to respondent must have been of such a nature as to convey to any person examining the property some visible evidence of the fact that Schneider had transferred his right to a third person. It is also said that there must have been something in the evidence to indicate that someone other than Schneider was claiming title to the homestead, and that, after Schneider's death, someone other than his personal representatives was in possession of it. In making these suggestions appellant temporarily loses sight of the comedy of errors out of which arises this most interesting litigation. Appellant, claiming never to have seen the homestead before the probate sale, had, together with the remainder of the world, only such constructive notice as was imparted by the records of San Bernardino County, if we for the moment forget the claim of respondent concerning the alleged constructive notice conveyed by its possession. In fact, appellant contends that the only notice he ever had was that furnished by the record. And yet—and this is the fact which appellant temporarily forgets—the county records showed title in the government to the parcel within

which lies the homestead, from the recording of Schneider's deed to the government, in 1901, to the recording of the government's disclaimer, in 1920. Schneider's occupation from 1901 to 1907 and respondent's occupation from the latter year to 1920 are referable to the same mistake—the belief on the part of Schneider that he had omitted from his deed to the government the portion of lot 5 within which lay his little homestead. Considering this just view, it made no difference whether, as time rolled on for nearly twenty years, the possession of the property was that of Schneider, that of his personal representatives, that of the predecessors of respondent, or that of respondent itself. No matter what persons were in possession among all these, their possession was in opposition to the record title. At least, it was apparently in opposition to the record title, for there is no claim made that the evidence of possession, in any of its factors or elements, that is, the *possessio pedis*, or actual possession, pointed in any way to the government as the occupant. The world, then, including appellant, was put upon such notice, from 1901 to 1920, as the evidence of possession imparted, and was during the same period put upon corresponding inquiry. What the nature or effect of that notice was we shall presently inquire.

If, however, we forget the very evident situation outlined in the paragraph just closed and meet appellant on the ground chosen by him, we must remark that there was in August, 1907, a change in the possession of the homestead which must have been evident even to the casual observer. For a long time prior to that month Schneider had lived alone upon the property. After that month he was never again to be seen upon it, and in his place there at once appeared the various members of respondent, and particularly, at first, the diligent De Hart. We need not here repeat the recital of the activities of this member of the Mountain Club during the weeks that he occupied the homestead immediately upon the departure of the aged Schneider. It is enough to say that his movements about the place were such that they must have at once struck an observer as indicating a complete control and dominion over it. If we attend to appellant's contention that the change of possession must have been such as to give notice that persons other than Schneider's personal representatives were in control of the

67 Cal. App.—16

property, a ready answer is at once apparent. Schneider lived for four years after his departure from the homestead and the entry of respondent's predecessors upon it. He could have had no personal representatives during that period. In fact, he actually had none until when in 1919, twelve years after he gave up his residence on the homestead, the public administrator was granted letters upon his estate. Whether appellant, a purchaser at a sale under the probate proceedings, is bound to take notice of this fact, we need not pause to inquire, as during the four years preceding Schneider's death the change of possession had not only occurred, but respondent and its predecessors had exercised a marked and notorious dominion over the property, unembarrassed by the presence of Schneider for a single moment. [4] From these observations it is apparent that appellant's point that there was no striking evidence of change of possession must fall.

[5] The nature of the possession of real property which will operate to impart notice to the world, and, therefore, to a purchaser for value who claims to rely upon the record title, is pointed out in cases cited in appellant's brief: 1. The possession must be open, visible, unambiguous, exclusive, uninterrupted and notorious (*Hellman* v. *Levy*, 55 Cal. 117; *Randall* v. *Allen*, 180 Cal. 298 [180 Pac. 941]); 2. It must indicate the occupant (*Randall* v. *Allen, supra*). The last of these requisites is, in particular cases, to be found as a resultant from those enumerated in the first list. This is shown in one of the cases cited, the opinion in which also points out the general character of the possession which will convey constructive notice of the claim of the occupant. The court in that case refers to *"Cox* v. *Devinney,* 65 N. J. L. 389 [47 Atl. 569], wherein it was held the record purchaser was not charged with notice by a possession of the character indicated [in an earlier part of the opinion]. The court states [in *Cox* v. *Devinney*] the reasons for the decision as follows: 'While the general rule is that possession of land is notice to a purchaser of the possessor's rights therein, nevertheless such possession, to be effectual, as notice, must be not only exclusive and uninterrupted, it must also be open, notorious and visible, i. e., *it must indicate the occupant.* The fact that lands are under cultivation does not, of itself, suggest that anyone other than the reputed

owner of the premises is in possession of them. In order to charge a purchaser with notice, the occupation must be of a character which would put a prudent person upon inquiry; it must indicate that someone other than he who appears by the record to be the owner has rights in the premises. . . .' With the general principle of *Cox* v. *Devinney* (putting upon the statement that the possession 'must indicate the occupant,' the meaning which was undoubtedly intended, that it must indicate an occupant other than the record owner, not that it must indicate who the occupant is) the decisions of this state are in accord. . . . They may be summed up as holding that possession in order to be sufficient to establish notice must be open, notorious, exclusive and *visible,* and not consistent with the record title. This is likewise the general rule in this country upon the point. . . . Underlying these requirements is the idea that the circumstances relied on to establish constructivee notice, whether they be possession or something else, must be such that a prudent man would be put upon inquiry.'' (*Randall* v. *Allen, supra.*) The rule governing such cases is also pointed out in *Bessho* v. *General Petroleum Corporation,* 186 Cal. 133 [199 Pac. 22]. To indicate how fully the facts in the present litigation satisfy the requirements of the decisions upon the point now under examination we have only to direct attention to the testimony which we have so fully stated. The evidence shows a possession not consistent with the record title, whether that title be viewed in its aspect as resting in the government, from 1901 to 1920, or as resting in the estate of Schneider, during the brief period in 1920, between the date of the recording of the government's disclaimer and the date upon which appellant purchased at the probate sale. Further, the possession was surely of a character calculated to put a prudent man on inquiry. [6] To our minds the evidence plainly supports the finding of the trial court to the effect that appellant was not a purchaser without notice.

[7] The next point made by appellant is that respondent and its predecessors have been guilty of laches in the commencement of the action and are therefore not entitled to equitable relief. The disposition of this question is largely affected by what we have said in discussing another point, for the present question is based upon the fact that the de-

scription in the deed from Schneider to the predecessors of respondent called for a tract of land bounded by right lines. It is said that this circumstance should have apprised respondent at once of the fact that the Schneider homestead was not the property intended to be conveyed by the deed. We need not here repeat and are content merely to refer to what we have already said upon this specific point in disposing of the question whether there was a mutual mistake at the time of the execution of the deed, concurred in by Schneider and respondent's predecessors. We may add, however, a few brief observations tending even more strikingly to show the utter futility of the contention that respondent has been guilty of laches. Having entered upon the homestead under the apparently well-founded conviction that the irregularly shaped tract lay within the exterior boundaries of the regularly bounded 20.82 acres of lot 5, respondent was confirmed in its mistake, rather than disabused of it, with the passing years. The possession of the club was kept intact from 1907 to 1920 without even the hint of molestation. During the first four years of this time Schneider was alive and was content, at least as far as the fate of the homestead was concerned. There is not a breath in the record to indicate that he did not end his days in the belief that he had conveyed the inclosure to the predecessors of respondent. To show how all circumstances conspired to perpetuate the original mistake, most natural, certainly, to the extent that the members of respondent participated in it, we are to observe that the assessor of San Bernardino County labored under it as well, for it will appear when we come to consider another point made by appellant that the assessor, in assessing the taxes against respondent upon the 20.82 acres, included an assessment for the improvements on the homestead as being within that acreage. This course he pursued year after year. It is difficult to perceive how appellant, under such an array of circumstances, can seriously make the claim that respondent has been guilty of laches. The real situation is most simple. Respondent had no hint until after appellant bought at the probate sale that the mistake of the long ago had actually occurred and under all the circumstances the lateness of its disillusionment was both natural and excusable. This action was commenced a little more than fifteen months

after the probate sale was confirmed by the superior court, taking even the date of the filing of the amended complaint as our guide, the date of the filing of the complaint not being shown by the record. Under all the circumstances respondent was sufficiently diligent in the commencement of the suit.

[8] It is insisted that respondent is estopped to claim against appellant the relief which was awarded by the trial court, and appellant, in making the point, states that it is closely allied to two questions of which we have already made disposition, that is to say, first, that there was no mistake in either the execution or acceptance of the deed from Schneider to respondent's predecessors, and, second, that respondent was guilty of laches in the commencement of the action. To our minds the relationship between the questions is so close that the present point is determined by what we have said as to the other two. In our opinion the asserted estoppel does not exist.

Another point made by appellant is that the evidence is insufficient to support a finding of the trial court that respondent acquired title to the Schneider homestead by adverse possession. The solution of this question depends upon the terms of section 325 of the Code of Civil Procedure, which provides, in part: "For the purpose of constituting an .dverse possession by a person claiming title, not founded upon a written instrument, judgment or decree, land is deemed to be possessed and occupied in the following cases only: 1. Where it has been protected by a substantial inclosure. 2. Where it has been usually cultivated or improved." The section also requires that, in order to establish a title by adverse possession, it must be shown that land "has been occupied and claimed for the period of five years continuously" and that the occupant has "paid all taxes, state, county, or municipal, which have been levied and assessed" upon the land. Respondent claims and the trial court found that title by adverse possession was acquired because of an occupancy of the homestead during the years 1911 to 1915, inclusive. [9] Appellant's first assault on the finding is upon the contention that the property was not protected by a substantial inclosure during the period. In view of the evidence we may dismiss with a mere mention all question as to the nature of the inclosure on the easterly and west-

erly sides. The record amply shows that a substantial fence was maintained on both of these sides. The only reason for reserving question as to the northerly and southerly boundaries for separate treatment is that, on the north and at least partially on the south, natural obstructions are relied upon as constituting the inclosure on those sides. The subdivision of section 325 which is numbered 1 is satisfied by the employment of natural barriers for the purpose of completing an inclosure, provided only that they be effective as part of an actual inclosure, the usual measure as to their effectiveness being found in the answer to the question whether they will turn cattle (*Goodwin* v. *McCabe,* 75 Cal. 584 [17 Pac. 705] ; *Smith* v. *Hicks,* 139 Cal. 217 [73 Pac. 144]). The record here presents an answer to that question which shows a substantial support for the finding of the trial court. We consider first the northerly boundary. De Hart refers to the buckthorn which Schneider could not penetrate at all—that is "unless you cut your way in," and he further characterizes it as so dense that cattle would not go through it, so thick that it would turn cattle and so thick that cattle would not go through it. Biggin says, of the north side, that the country there is impassable. Turning now to the question of the southerly boundary line. Cave testifies concerning Schneider's time that along the bank, where it was necessary to keep cattle out there had been brush piled and poles put across. De Hart says that the bluff of the Santa Ana River . . . is a bluff which is straight enough up and down—perhaps five or six feet so that cattle could not come in there, and that it seemed to him that while he was a member of respondent the Santa Ana side of the fence was carried all the way along. Biggin testifies that fence was built along the entire river bank, but that part of it, along with part of the bank, was washed out by storms in 1916, and that the part of the fence thus destroyed was replaced by the club the next spring. There can be little doubt as to the nature of the "fence" on the northerly and southerly sides from this separate consideration of those sides, but its effectiveness as a whole, still, however, keeping more particularly in mind the northerly and southerly sections of the barrier, is shown decisively by some of the testimony. De Hart testifies that at the time Cave and he talked first with Schneider the fence was sufficient

to protect the ranch, there being alfalfa in the barn at the time. Speaking of the time during which he was a member, which ran for eight or ten years after 1907, De Hart says that the property was entirely closed by these obstructions and fences, so much so that it kept the cattle out which were pastured on the ranch, evidently referring to near-by property, and that there was a growing alfalfa patch on the homestead which would naturally attract them. He also says that the stock driven in by members was kept pastured inside the inclosure, that while the fence was not continuous, it made a continuous "fence" with the nature of the land, and that the club maintained a fence that would keep stock out and keep the stock of the members in. Biggin testifies that the fences have always been kept in sufficient repair to keep the stock out and that where there was no fence there was a natural barrier. We have no doubt, after a consideration of all this evidence, that the trial court was eminently justified in finding that the homestead was protected by a substantial inclosure during the years 1911 to 1915, inclusive.

[10] It is contended that the finding as to adverse possession is unsupported by the evidence for the reason that, to quote from the statute, the homestead was not shown to have been "usually cultivated or improved" during the period covered by the finding. We are satisfied that this contention is not well founded, but, having gone so fully into the question of inclosure, we do not find it necessary to be at equal pains upon the present point. We merely refer, as a sufficient support for the finding in the respect mentioned, to the testimony in the record concerning the manner in which the alfalfa and apple trees were irrigated and cared for and the crops harvested from 1907 until the irrigation ditch was washed out in 1916.

[11] Appellant's final contention is that the finding as to adverse possession is not supported by the evidence because the record fails to show that respondent complied with the provisions of the statute concerning the payment of taxes. It has been said that in order to meet the requirement a claimant of title by adverse possession "must prove either that no taxes were levied and assessed upon the land, or that he had paid all taxes which were levied thereon" (*Allen* v. *All-n,* 159 Cal. 197 [113 Pac. 169]). In the present case the evidence shows that no taxes were levied

or assessed upon any land which embraced the Schneider homestead during the years 1911 to 1915, inclusive, except in a single instance presently to be noticed, although in each year an assessment was made upon the north 20.82 acres of lot 5, or upon 20.82 acres in lot 5, the tax so levied having been paid in each instance by respondent. We have observed in another place, as illustrating the *contretemps* which runs through the entire record here, that the several assessments of taxes on the 20.82 acres included an assessment for the improvements on the homestead. Respondent therefore actually paid taxes annually upon those improvements, in connection with the payments made upon a tract of land on which they were not situated, although that fact appears not to affect the present question. We have mentioned one instance in the period 1911–1915 in which a tax was assessed against land on which the Schneider homestead is located, although the sequel will show that a considerable portion of the homestead lies outside the boundaries of the tract against which that assessment was levied. In 1912 an assessment was made in the name of Schneider against the north 30.62 acres of lot 5. This assessment, the tax not having been paid, was carried on the delinquent rolls until in 1916, when, upon the application of respondent to the board of supervisors, it was canceled as a double assessment. While it was double as to the north 20.82 acres of the lot it was not double as to 9.80 acres lying south of the former area. Appellant says that it was the duty of respondent under the law as to adverse possession to pay the tax upon the 9.80 acres, and this is the sole ground upon which he contends that, in the matter of the payment of taxes, the finding as to adverse possession is not supported by the evidence. He says that the order canceling the assessment, made in 1916, cannot reach back and excuse a failure to pay, as, so he says, the tax as to the last-mentioned acreage was valid. No authority is presented to sustain this contention, and respondent cites none which is in point, to our minds, to dispute it. As we regard the question now under consideration as the only doubtful one in the case, and as it appears, as far as we can discover, to be one of first impression, we shall proceed, with care, to analyze a little more circumspectly the point made, and shall then, with an equal degree of circumspection, endeavor to

ascertain the facts to which it is to be applied. We shall assume, without deciding, that appellant is correct in his postulate that the order of the board of supervisors made in 1916 does not of itself excuse respondent's failure to pay the tax based' upon the questioned assessment. In other words, we shall determine the question as if the order of the board had never been made and upon the assessment itself. There is yet another circumstance to be noted in stating the question. We do not perceive how, as appellant contends, respondent was liable to pay or how he could have paid any tax on the 9.80 acres, and this for the simple reason that the amount of that tax could not have been ascertained. It certainly, so it seems to us, could not be reckoned upon the employment for purposes of computation of a fraction the numerator and denominator of which are, respectively, 9.80 and 30.62. It appears to us that if respondent, in order to satisfy the statute as to adverse possession, must have paid any tax under the questioned assessment he must have paid the entire tax, for two reasons: 1. Regarding respondent as the claimant to the homestead the assessment was not double even as to the 20.82 acres, as respondent's ownership of record of that tract is a fortuitous condition. Considering respondent as the occupant of the homestead the present question must be treated as if some other person were the record owner of the 20.82 acres. 2. It apparently matters not if the assessment were double as to 20.82 acres. Still viewing the situation from the standpoint of respondent as the occupant of the homestead, the board of supervisors should have canceled the assessment on the 20.82 acres, which does not include the homestead, and not the assessment on the 30.62 acres, which does include about two-thirds of it, as the facts now to be outlined will show. There is in the record a plat which delineates lot 5 and which shows the location within it of the homestead. The southerly boundary of the 20.82 acres is also shown. The homestead lies wholly south of that boundary. We have measured, as nearly correctly as we may, half the distance from the northerly boundary of lot 5 to the southerly boundary of the 20.82 acres and at an equal distance south of the last-mentioned boundary we have drawn across the lot as shown on the plat a line parallel to that boundary. We have by that process inclosed a tract approximately one-half the

size of the 20.82 acres, or 10.41 acres. When we add the acreage of the two pieces we have a tract approximately 31.23 acres in extent, near enough in size to the assessed tract of 30.62 acres to answer our present purpose. The adoption of this process is made necessary, it will be observed, because of our inability to draw from the record before us a line which will exactly exhibit a smaller tract of 9.80 acres or a larger tract of 30.62 acres. The surveyor who made the survey from which the plat in the record is produced testifies that the Schneider homestead contains approximately five or six acres. The plat shows that more than one-third of the homestead lies south of the line we have drawn and therefore outside the 31.23-acre tract. If we take the extreme acreage of the homestead as stated by the engineer, that is, six acres, we are able to say that less than four acres of it lie within the 31.23-acre tract. This four acres, approximately, also lies, as we have already indicated, within the · tract of about 10.41 acres confined on the plat by the line which we have projected. Moreover, the homestead is entirely surrounded by the superficies of the 10.41 acres except on its southerly side. If we attempt to depict the situation more graphically we may liken the 31.23 acre tract to a rectangular sheet of paper, whereupon it will appear that four acres minus may be represented by an irregularly shaped fragment torn from about the middle of the lower side of the sheet. The relationship of this fragment to the paper from which it is taken will stand in the proportion of —4 to approximately 31.23. Keeping in mind the facts thus stated, and returning from our approximate acreages to the exact figures which result from the assessment, we may state in several forms the question to be solved by us: 1. Was respondent bound to pay the entire tax on the 30.62 acres? 2. Was it bound to pay a tax, computed in whatever manner, upon the 9.80 acres? 3. Was it bound to pay a tax, computed in whatever manner, on the less than four acres of the homestead included within the 9.80 acres? 4. Stating the problem negatively, respondent surely was not bound to pay a tax upon the entire homestead, for more than one-third of its area lies outside the 30.62 acres and was unassessed in any sense.

We have found no authority which fits the peculiar conditions shown by the record, but we are able to discover

analogies between certain propositions of law and the question before us and from them we are enabled to determine the point. In a standard work the very general proposition is laid down that "To establish a lien for taxes on realty and sustain proceedings for the forfeiture or sale of the land for nonpayment of the tax, it is necessary that the assessment shall contain such a description as will identify the particular parcel of land assessed with certainty and beyond any reasonable possibility of doubt or mistake" (37 Cyc. 1052). It is said in another work that "A sufficient description of the property intended to be assessed is inherently essential to a valid tax on real estate, and if the property is not described in the assessment list with sufficient accuracy and particularity to render it capable of ready identification, the tax thereon is void" (26 R. C. L., tit. Taxation, par. 314). A well-known author writes, "In listing the land [for taxation] it must be described with particularity sufficient to afford the owner the means of identification, and not to mislead him" (Cooley on Taxation, 3d ed., p. 740. See, also, *Best* v. *Wohlford*, 144 Cal. 733 [78 Pac. 293]). Several California cases may be mentioned as having some bearing upon the point now under consideration, although it is to be understood that in none of them were the facts closely akin to those now before us. They are cited merely as instances showing specific application of the general principle embraced in the quotations above set forth. It is said in one case that "the statute requires that the description, either by common designation, or name, or by metes and bounds, shall appear on the face of the assessment-roll; so that by inspecting it, the owner and all other persons may know what particular land is assessed" (*People* v. *Cone*, 48 Cal. 427). It is also said that "the description should be sufficient in itself to identify the land" (*Miller* v. *Williams*, 135 Cal. 183 [67 Pac. 788]), and that an assessment must contain something "which would establish the identity of the tract or parcel of land sought to be assessed. . . . —a necessary thing in proceedings to enforce the collection of a tax" (*Smith* v. *City of Los Angeles*, 158 Cal. 702 [112 Pac. 307]). Other decisions of the supreme court might be cited in support of the general principle which we have in mind, but we need not take the

time nor the space to list them. In relying on the principle we are not unmindful of the fact that the assessment here in question is perfectly plain on its face. It describes the north 30.62 acres of lot 5, a parcel of land to be located with consummate ease, but the tract to which appellant seeks to fasten the assessment is the Schneider homestead, and under that contention it appears to us that respondent, as the occupant of the homestead, is the "owner" who is to be enabled under the law to identify its land as the land assessed. The question which we are to decide is not whether the assessment is sufficient to stand as the levy of a tax on the north 30.62 acres of lot 5, but whether under it respondent must have paid a tax on the homestead, situated partly within and partly without the acreage mentioned, in order to satisfy the statute requiring the payment of taxes to establish a title by adverse possession. We cannot avoid the conclusion that respondent was not required so to pay and that the trial court was justified in making the implied finding, embraced within its finding as to adverse possession, that the homestead was not assessed for taxes in the year 1912.

Judgment affirmed.

Finlayson, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 10, 1924, and the following opinion then rendered thereon:

THE COURT—The application for a transfer and hearing by this court after decision by the district court of appeal is denied. We are of the opinion that the evidence is sufficient to sustain all of the findings of fact which were necessary to support the judgment in favor of the plaintiff upon the first cause of action, which was for reformation of the deed, and we are satisfied with the conclusion of that portion of the opinion of the district court of appeal which deals with the questions arising under said first cause of action. This conclusion renders it unnecessary to determine whether or not the evidence is sufficient to support the finding and conclusion of the trial court that plaintiff acquired title by adverse possession.

We therefore neither approve nor disapprove the portion of the opinion of the district court of appeal which deals with that question.

All the Justices concurred.