[Civ. No. 1951. Third Appellate District.—December 31, 1920.]

ELITHA C. WILDER, Respondent, v. FRANCES NICO-LAUS, as Executrix, etc., Appellant.

[1] BOUNDARIES—ACQUIESCENCE IN EXISTENCE OF FENCE—LOCATION ON TRUE LINE—ABSENCE OF AGREEMENT—EFFECT OF.—The construction of a fence between adjoining land owners and acquiescence in its existence for many years does not establish the true boundary line in the absence of an agreement that the fence was on the true line.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

George & Hinsdale and Stephen W. Downey for Appellant.

R. Platnauer and Hugh B. Bradford for Respondent.

THE COURT.—The action was brought to quiet title to an irregular piece of land containing about twenty acres. It is described in the complaint and findings by metes and bounds, the southern boundary of which as ''the quarter-section line running easterly and westerly through the center of sections 13 and 14, township 5 north, range 5

----

1. Location of boundaries by acquiescence or agreement, notes, 69 Am. Dec. 711; 27 Am. Rep. 239.

east, M. D. M.'' The strip in question is represented by
the colored portion of the following diagram:

T. 5 N. R. 5 E. M. D. M.

The vital controversy in the case is as to the location of
the southern boundary line of plaintiff's land, and the
solution of this question depends upon the location of the
center of said sections 13 and 14. It is not disputed that
the legal title to the land lying north of a line connecting
these centers belongs to plaintiff, and that lying south
is the property of defendant. The contention of the latter
is, however, that said southern boundary line constitutes
the northern boundary instead of the southern of said
disputed strip, the distance between them being 234.13
feet at one end, and 222.60 at the other, as shown on
the diagram.

Admittedly, plaintiff's title is deraigned through two
patents from the state of California of swamp-land sur-
veys, numbered 77 and 78. Survey No. 77 was patented
to W. C. Hopping, March 15, 1861; the land conveyed
being described as follows: "Survey No. 77, Swamp and
Overflowed Lands Sacramento County, Township No. 5
North, Range 5 East, Mt. Diablo Meridian, Sec. 14. The
east half of section 14, more particularly described in the
field notes as follows: Beginning at a quarter section corner
of the north line of section 14, in Township 5 North, Range
5 East of Mount Diablo Meridian. Run thence south 80
chains, thence east 40 chains, thence north 80 chains thence
west 40 chains to the place of beginning, containing 320
acres, lines run by the true meridian variation 15 degrees and

30 minutes east." On February 1, 1883, W. C. Hopping conveyed to Ben W. Wilder "the N. E. ¼ of section 14, Township 5 North, Range 5 East, M. D. B. & M.," and on January 7, 1898, the latter conveyed to plaintiff "the northeast quarter of section 14," same township and range.

Survey No. 78 was patented to Wm. N. Brainard, March 15, 1861. The land not involved in this controversy being omitted, the description in said patent is as follows: "Survey No. 78 Swamp and overflowed Lands, Sacramento County, Township No. 5 North, Range 5 East, Mount Diablo Meridian, Section 11, 13 and 23. . . . The West ½ of section 13 . . . more particularly described in the field-notes of said survey as follows: Beginning again at the southeast corner of section 11 run thence south 80 chains, thence east 20 chains, thence north 80 chains, thence west 20 chains to the place of beginning containing 160 acres." On September 2, 1895, B. W. Wilder obtained a judgment in the superior court of Sacramento County against William N. Brainard, adjudging that said Wilder was the owner in fee of "the W. ½ of the N. W. ¼ of section 13," of said township and range and quieting his title thereto, and on January 7, 1898, said Wilder conveyed to plaintiff the same property as thus described. Plaintiff also deraigns title through a deed from George O. Higgins et al. to B. W. Wilder, and dated February 1, 1859, wherein the property is described as the W. ½ of the N. W. ¼ of section 13 and the N. E. ¼ of section 14 in said township and range.

Defendant's title is connected with a deed, dated December 28, 1865, executed by Wm. R. Wilder and Frances E. Wilder to Wendel Kearth, describing the land by metes and bounds, "beginning at the N. E. corner of the W. ½ of the S. W. ¼ of section 13, thence running west to the geographical center of section 14"—followed by other calls unnecessary to mention—and "including the following tracts of swamp and overflowed lands, to wit: The South half of section 14, in Township 5 North, Range 5 East, being a part of swamp surveys No. 76 and No. 77, containing 320 acres, more or less; also S. W. (W.?) ½ of S. W. ¼ of section 13," same township and section, "containing 80 acres more or less."

It thus appears that the land conveyed to plaintiff and also that conveyed to defendant is described by legal subdivisions and, furthermore, there is no doubt that the exterior boundaries of the surveys had their initial point at some United States section corner. The controversy, though, as to the location of the division line between the parties arises from the circumstances, that said sections 13 and 14 do not appear to have been fully surveyed by the United States, that no monuments of such survey can be found at certain section corners, that the so-called swampland surveys were made by the county surveyors, and it is the claim of appellant that these latter surveys must be followed, and that, in accordance therewith, said division line lies north of the disputed strip, although the United States survey may show it to be south.

It may be said, though, that the United States survey is the basis for the survey by the county surveyor under the direction of the surveyor-general, and the law makes it the duty of said official to have the survey made "as near as practicable, in accordance with the surveys of the public lands of the General Government" (Stats. 1855, p. 191); and as we might expect, we find swamp-land survey No. 77, beginning at the northwest corner of section 14, and the field-notes end with this statement: "And surveyed in accordance with the instructions of the Surveyor-General, and being a continuation of the United States Surveys." The initial point of survey, No. 78, is stated as the southeast corner of section 11, and the field-notes conclude with the same statement as in 77. No doubt said reference is to the corners as located in accordance with the United States survey. It is true that the southeast corner of section 11 does not appear to have been established and set by the official survey made by the United States, but the exterior boundaries of section 11, the line between sections 11 and 14 and the western boundary line of 14 had been surveyed and established. Hence, there would seem to be no difficulty in determining on the ground the location of said corner of section 11. But even if the exact location of said corner is left in doubt, the evidence shows that the north line of section 14, as surveyed by the government, corresponds with the northern boundary of plaintiff's land. The con-

veyance, therefore, of the N. E. ¼ of section 14, nothing appearing to the contrary, would carry the title to a strip of land 40 chains square, but 40 chains south from said northern line would include the disputed strip in said section 14.

A similar condition exists as to the portion of said strip in section 13. The northern boundary of said section is the continuation of section 14, and forty chains south therefrom reaches the line drawn through the centers of said sections, as shown on the diagram. The location of the northern boundary of plaintiff's land and the designation of the legal subdivisions thereof, in the absence of nullifying evidence to the contrary, seem to justify the finding of the court that the southern boundary thereof lies south of the disputed strip.

Of other circumstances tending to confirm this view, we refer to the testimony of the surveyor, J. J. Rooney. He made a survey of the premises in accordance with the United States survey and he made a map thereof. This map was received in evidence and it shows the southern boundary of plaintiff's land to correspond with the southern boundary of said disputed strip. Of some importance, also, is the testimony of J. A. Wilder, the son of B. W. Wilder, who declared that there was a stake in the northern boundary line of section 14, having a surveyor's mark upon it, which was generally recognized around that vicinity as being a government survey stake, that subsequently the stake was taken up and some coal was found deposited at the foot of it. "In connection with the Wilder place, as it now exists, that is the north- west corner of quarter section 14, it is the northwest corner of the place known as the Wilder place." He proceeded to state that he and his father measured south from that point, 160 rods, and it carried them seventeen rods south of the northern boundary of the disputed strip.

It may be added that there is nothing in the evidence to show that the acreage claimed by plaintiff is in excess of what her deed calls for, and even some of the maps introduced by defendant and representing the swamp-land surveys, show the exterior lines of these sections to correspond exactly with the map and the survey made by

the United States and in accordance with the claim of plaintiff herein.

The principal evidence relied upon by appellant to support her claim as to the location of the division line consists of the expert testimony of a prominent civil engineer and surveyor, but his opinion was based upon certain data of somewhat speculative and uncertain value and is subject to the familiar objections to this kind of testimony. Its force was also weakened by the cross-examination, and attention may be called to this significant admission by him that "the actual position of this fence is 3.57 chains north of the location of the center of section 14, as the same would be located by the projection of the United States surveys. The point where the line would be located between the Wilder and Nicolaus ranches, according to what I have testified, would entirely depend upon where I made my starting point. . . . The map that I made did not coincide with the United States general map, but it did coincide with the swamp-land. The fence line will not agree with the United States government line. . . . The northwest corner of the land occupied by Wilder is practically in the center of the road; the line is on the center line of the county road; that is, on the west boundary. The distance from the center of the county road south of the fences that we are speaking about is 36.43 chains." The witness also testified that in 1853 "the United States surveyor had located the east boundary on Nicolaus' east line of 13 and had fixed the south corner of 13." This was three years before the said swamp-land surveys were made by the county surveyor and it would, therefore, appear that from the established government survey the county surveyor could locate the initial points of the two surveys, Nos. 77 and 78, and the presumption is that he followed that course, and located on the ground the half section corners of the sections 13 and 14, as called for by the government survey, notwithstanding the opinion of the witness to the contrary. Hence, if we accept the government survey as controlling, the conclusion cannot be avoided that plaintiff is the owner of the legal title to the land in dispute; and, if we must follow the survey of the county surveyor, it is at least a

fair inference that he established the division line in accordance with the government survey.

Great stress is laid by appellant upon the point that "the location of the true boundary line, common to the 'Wilder' and 'Kerth' ranches, due to the conflicting surveys of the United States and of the state, is uncertain, and is believed by the owners to be uncertain, and the survey, location, and staking of the line between the two ranches by the Surveyor Winn in 1871, the construction thereon in 1873 or 1874 of the line fence, ever since maintained on that line, and the acquiescence of the plaintiff and her predecessor in interest for upward of forty years in the line so surveyed and fenced as the true boundary line between the two ranches, conclusively establishes that line and the fence built and maintained thereon, the true boundary between the two ranches."

As to the law applicable to such situation it is apparent that the earlier view of the supreme court has been modified by the later decisions, or, at least, that the correct doctrine was not fully stated in the earlier opinions. For instance, in *Sneed* v. *Osborn*, 25 Cal. 619, it is declared that "when the owners of adjoining lands have acquiesced for a considerable time in the location of a division line between their lands, although it may not be the true line according to the calls of their deeds, they are thereafter precluded from saying it is not the true line."

The rule is more fully and accurately stated in *Grants Pass Land etc. Co.* v. *Brown*, 168 Cal. 456, [143 Pac. 754], as follows: "When such owners, *being uncertain* of the true position of the boundary so described, *agree* upon the true location, mark it upon the ground, or build up to it, occupy on each side up to the place thus fixed and acquiesce in such location for a period equal to the statute of limitations, or under such circumstances that substantial loss would be caused by a change of its position, such line becomes, in law, the true line called for by the respective descriptions, regardless of the accuracy of the agreed location as it may appear by subsequent measurements. . . . And if the line is located and agreed to, not for the purpose of settling an uncertainty in the minds of the parties as to the position of the true line upon the ground, but to take land from one owner and

transfer it to the other, or *without the intent* to fix the true line, such agreement is invalid and does not change the legal boundary nor affect the title of either party to the land he previously owned.''

In *Friedman* v. *Southern California T. Co.*, 179 Cal. 266, [176 Pac. 442], it is said: ''But the doctrine can be invoked only where the adjoining owners, being uncertain of the actual position of the boundary described in their deeds, agree upon its true location. . . . The validity of such an agreement rests upon the belief and understanding of both parties that they are establishing the true boundary line between their properties.''

The latest expression of the supreme court to which our attention has been called is found in *Staniford* v. *Trombly*, 181 Cal. 372, [186 Pac. 599], wherein it is declared that ''a fence built between adjoining property owners for the purpose of preventing the straying of stock and not built upon an agreed boundary line, which boundary line was uncertain when the fence was built, cannot be considered as establishing the true boundary line between the properties, notwithstanding the acquiescence in the existence of the fence and the occupancy of each property up to the fence for a period of thirty years after its construction.'' The court held that the acquiescence in the existence of the fence and the occupancy of the land did not amount to an agreement that it was upon the boundary line.

[1] In this case there is no doubt of the existence of the fence and the occupancy of the land as claimed by appellant for a much longer period than required by the statute of limitations. But it is claimed by respondent that there was no uncertainty as to the location of the true boundary line, and there was no agreement that the fence was on the true line.

We may notice only the latter contention, as it is decisive of the controversy. Whether the circumstances, in the absence of direct evidence, would require a conclusion favorable to appellant, we need not determine, since there is the testimony of two witnesses to the effect that there was no such agreement between the owners of the property at the time the fence was built. This testimony is the subject of mirth and derision on the part of

appellant, but its credibility was manifestly for the determination of the trial court. Assuredly, we cannot say that it is inherently improbable, although it may appear somewhat remarkable that they should remember a conversation for forty years. We may quote the testimony of J. A. Wilder, as follows: "I am a son of Benjamin W. Wilder. On my twelfth birthday, March 25, 1874, my father and I started from Shingle Springs and arrived at the ranch where we now are, on March 29th. We put up a little cabin there to live in, and then we built some fence between our place and W. R. Bradford. We were there about two or three weeks. I saw Mr. Kearth; he talked with my father in my presence. Mr. Kearth came up to where we were building that fence and spoke to my father about he was going to build that line fence on the south; he had not started then; he was then working on the west fence. He said: 'Mr. Wilder, there is lots of water down there on me; I am going up on you sixteen rods.' My father said, 'Mr. Kearth, you go right on the line, and don't come on me an inch.' " He further testified that, after the fence was built, the following conversation took place: "My father said, 'Mr. Kearth, you came upon my land.' He said: 'Yes.' 'Well,' he said, 'You move the fence back.' He said: 'I won't do it. You want your land, you go up on Owen on account of the water.' "

From this and other testimony the court was amply justified in the conclusion that there was no agreement as to the fence being on the boundary line.

In explanation of the inaction for so many years of plaintiff and her predecessor in interest in reference to this fence, it may be said, as a matter of common knowledge, that until a comparatively recent period, this overflowed land was considered of such trifling value as hardly to justify the expense of any litigation to settle the title to a few acres.

In this connection it is urged that the court committed error in overruling an objection to the testimony of these two witnesses as to certain declarations made by their father in the absence of Mr. Kearth in reference to this fence. But conceding error in that respect it is sufficient to say that the point is made for the first time in the

closing brief of appellant and we would be justified, therefore, in ignoring it. (*Kahn* v. *Wilson,* 120 Cal. 643, [53 Pac. 24].)

Moreover, it is quite apparent that the error was not prejudicial. It added nothing to the effect of the testimony as to the conversation between Wilder and Kearth. If such testimony had been given by another witness there might be some merit in the claim that it had probably influenced the decision.

As to adverse possession, the court was perfectly justified in finding against appellant. The fence was constructed in 1874, less than five years prior to the amendment of 1878 of section 325 of the Code of Civil Procedure, and while there is some evidence of the use of the disputed strip prior to this time by appellant's predecessor in interest, yet the court was warranted in finding that it was not exclusive and under a claim of right or such as to give notice of any hostile claim. (*Mattes* v. *Hall,* 28 Cal. App. 361, [152 Pac. 436].) Hence, for appellant to establish title by prescription, it was necessary to show that she and her predecessors in interest had paid the taxes on the disputed strip for five consecutive years.

It seems that the assessment was made to the adjoining owners according to the description in their deeds. In *Friedman* v. *Southern California T. Co., supra,* a similar situation was involved, and the court said: "Concededly, the defendant paid no taxes except those assessed upon the land described by its deed. Its claim that by reason of the representations and agreements of the parties the description in the deed should be regarded as extending to the fence is but an attempt, in another form, to invoke the rule of agreed boundaries, and this, as we have seen, cannot be done." The cases to the contrary cited by appellant where the assessment has been construed as extending to the fence were instances where the division line had been established by the parties. Such is not the condition here.

We can see no element of estoppel in the case. Neither the defendant nor Wendel Kearth was misled in any manner injuriously by any act or declaration of plaintiff's grantor. There is no evidence that either of them spent any money in improving the land or in erecting any struc-

ture thereon. In *Loustalot* v. *McKeel*, 157 Cal. 634, [108 Pac. 707], and *Young* v. *Blakeman*, 153 Cal. 477, [95 Pac. 888], buildings had been erected near the supposed boundary line under circumstances that would make it inequitable to disturb the possession and apparent title of the parties. Herein upon the facts found by the trial court the only persons who have been injured are respondent and her grantors, who have been deprived of the use of their land. (*Staniford* v. *Trombly, supra.*)

Under the rules by which this tribunal is governed, we think the action of the lower court must be upheld.

The judgment and order are, therefore, affirmed.