[Civ. No. 3379. Third Appellate District.—March 17, 1928.]

LUCY BANNING ROSS, Appellant, v. BURKHARD INVESTMENT COMPANY (a Corporation), Respondent.

202

Ward Chapman and L. M. Chapman for Appellant.

Anderson & Anderson for Respondent.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from a judgment in favor of the respondent Burkhard Investment Company, a corporation, in a suit to quiet title to lot eighteen of sheet No. four, in tract No. 3192, adjoining Wilmington, Los Angeles County.

This action involves the title to an irregular crescent-shaped tract of land some 600 feet in depth and 1,600 feet in length, situated within the boundaries of the city of Los Angeles at the southerly outskirts of Wilmington, and is bounded on the west by the Wilmington and San Pedro Road, and on the easterly and southerly sides by the extreme western basin of the inner harbor channel of the bay of San Pedro, containing some 15 acres of land. The respondent contends that the tract in controversy is a part of the Mexican grant of the Rancho Los Palos Verdes, which borders on the west inner harbor channel of San Pedro Bay; while, upon the contrary, the appellant denies this assertion and claims that it is a bit of "no-man's land" situated above the line of ordinary high tide, which was omitted from the survey of the above-mentioned rancho, and which is a part of a tract of tide land purchased by, and conveyed in 1880 to Phinneas

Banning, the father of appellant, by patent from the state of California.

Tide-land location No. 57 was adjacent to the southerly outskirts of Wilmington, bordering on the most northerly arm of the western basin of the inner harbor channel of San Pedro Bay. Tide-land location No. 68 lies southerly from and adjacent to the extreme westerly arm of the west basin of inner harbor channel, and includes the western portion of Smith's Island. By stipulation all the land contained within this tide-land location No. 68 has been eliminated from this appeal.

Rancho Los Palos Verdes was a vast tract of land granted to Jose L. and Juan Sepulveda by the Mexican government June 3, 1846, and the title to this rancho was confirmed by patent from the United States government in 1856. The description of this ranch contained in the patent commenced at a specified station on the shore of the Pacific Ocean, and continued thence by metes and bounds until it reached the "northwest corner of a warehouse at Sepulveda landing," and then continued as follows: "thence along high water mark along the Inner Bay of San Pedro, North 18 degrees . . . thence (to) a rock . . . at station No. 24 of the rancho San Pedro on high water mark about three chains west of Captain Ord's wells station; thence leaving the bay of San Pedro," etc. This Los Palos rancho was partitioned by a decree of the superior court of Los Angeles County in 1882, and divided into two portions fronting on the San Pedro Bay designated respectively lot "M" and lot "K." The last-mentioned lot consisting of nearly 170,000 acres of land was subsequently conveyed to E. N. McDonald and was thereafter sold to Joseph Burkhard in the year 1902, and thence it passed to the respondent Burkhard Investment Company, and was known as the "McDonald Rancho." In 1866 Phinneas Banning applied to the state registrar to purchase 460 acres of this tract known as "Tide Land Survey No. 57," which included all of the land involved in this action. This application to purchase tide-land was made pursuant to a statute authorizing the state to sell "swamp, overflow, salt-marsh and tide lands," except that all such lands within two miles of any town or village were exempt from sale. (Const. of Cal., art. XV, sec. 3; Stats. of Cal.

1869, p. 70, sec. 877, re-enacted 1887, p. 108; Pol. Code, sec. 3488.) In spite of this statutory exemption of tidelands situated within two miles of any town or village, a patent was finally issued by the state to Phinneas Banning for all the lands applied for except a small portion located at the foot of Canal Street. At the death of Phinneas Banning the westerly 80 acres of this tract, including the land in controversy, were distributed to the widow Mary Banning. Subsequently the widow died and her interest in this land passed to the appellant Lucy Banning Ross. In an action instituted in 1911, entitled *People* v. *Banning Co.,* 166 Cal. 630 [138 Pac. 100], a decree was duly entered declaring void this patent to the Banning tract in tide-land survey No. 57 on the ground that it was within the two-mile limit of Wilmington, and title to this land was thereupon quieted in the state of California. This decree was subsequently affirmed by the supreme court of the United States. (*Banning* v. *California,* 240 U. S. 140 [60 L. Ed. 569, 36 Sup. Ct. Rep. 338, see, also, Rose's U. S. Notes].) It will be observed that the application of Phinneas Banning to purchase this tide-land was filed in 1866, but the proceeding lay dormant until 1878, when one McFadden made a claim to the land and filed a contest to the Banning petition. Judgment, however, was entered in favor of Banning November 26, 1879, and a certificate of title was duly issued to him April 10, 1880. Wilmington was incorporated in 1872. The constitution of California was adopted in 1879. Wilmington was annexed to and became a part of the city of Los Angeles in 1909. In 1911 all the tide-lands on Wilmington Bay were deeded by the state of California to the city of Los Angeles. (Stats. of Cal. 1911, p. 1256; *Patton* v. *City of Los Angeles,* 169 Cal. 521 [147 Pac. 141].) Los Angeles filed a disclaimer in the present action by the terms of which it waived all claims to the land in controversy. In the case of *People* v. *California Fish Co.,* 166 Cal. 576, 603 [138 Pac. 79], it was held that the patent to the tide-lands in survey No. 57, which lay within the two-mile limit of the town of Wilmington was void, and that it passed no title thereto.

The appellant contends that (1) the tract of land in question was not included within the boundaries described in the

grant of the Los Palos Verdes rancho; that (2) she is the owner of this tract as successor in interest to Mary Banning by virtue of the tide-land patent formerly issued to Phinneas Banning, and that (3) she acquired title to this tract by adverse possession, the boundaries thereof having been settled by acquiescence.

We are of the opinion that the tract in question was clearly included within the boundaries of the Los Palos Verdes rancho as it is described in the patent issued in 1856. The San Pedro ranch adjoins the Los Palos Verdes ranch on the north. From the description of the last-mentioned ranch it is apparent that high-water mark along the coast was accepted as the boundary until it reached a point called "La Goleta" on the west side of San Pedro channel, excepting therefrom a certain government reservation. The government patent reads: "Beginning at a point on the shore of the Pacific Ocean at station No. 18, . . . thence along *high water mark* on the seaboard," etc., until it reached the "northwest corner of the warehouse at Sepulveda landing; thence along *high water mark along the Inner Bay of San Pedro,* . . . to a rock . . . at station No. 24 of the Rancho San Pedro, on high water mark, about three chains west of Captain Ord's wells station; thence leaving the Bay of San Pedro," etc. And in the decree involving the survey of this inner bay of San Pedro which description appears in the case of *Bixby* v. *Bent,* No. 2373, being a case which was tried in the county of Los Angeles, the following courses appear: "thence east . . . to a post marked 15 at the shore of the inner bay of San Pedro, thence *meandering along said shore* which is a boundary of said Rancho Palos Verdes. . . . " The boundary line of this inner bay of San Pedro was the subject of interpretation in the case of *De Guyer* v. *Banning,* 91 Cal. 400 [27 Pac. 761], and also in the case of *Los Angeles* v. *San Pedro Ry. Co.,* 182 Cal. 652 [189 Pac. 449]. The last-mentioned case accepted as the basis of ordinary high-water mark 5.1 feet above datum plane as the true boundary line of the inner channel of San Pedro Bay.

Since it is manifest that the grant to lot "K" of the Los Palos Verdes rancho, of which the land in controversy in the present action is a part includes high-water mark along the inner basin of San Pedro Bay, it necessarily fol-

lows that the land here involved passed to the grantees of said lot "K," and all of the land below high-water mark would belong to the state. The title to that portion which borders upon the San Pedro Bay below high-water mark belonged to the state and passed by deed to the city of Los Angeles, and the title thereto was formally disclaimed by that city in this proceeding. ■ The term "high-water mark" means neither an extremely high nor an extremely low water line, but upon the contrary refers to the ordinary high-water mark. Section 830 of the Civil Code provides: "Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tide water, takes to ordinary high-water mark, . . . " ■ That portion of the land which borders upon tide water, and which is below ordinary high-water mark, belongs to the state. (Civ. Code, sec. 670; 26 Cal. Jur. 315, sec. 532; *Ward* v. *Mulford,* 32 Cal. 365; *San Francisco Sav. Union* v. *R. G. R. Petroleum & Mining Co.,* 144 Cal. 134 [103 Am. St. Rep. 72, 1 Ann. Cas. 182, 66 L. R. A. 242, 77 Pac. 823].) In *Hardin* v. *Jordan,* 140 U. S. 371, 406 [35 L. Ed. 428, 11 Sup. Ct. Rep. 808, see, also, Rose's U. S. Notes], it is said: "Grant of the government for lands bordering on tide water extends only to high water mark. The title to shores and lands under water on front of lands so granted enures to the state within which they are situated."

■ The appellant did not acquire title to the land in question by virtue of the patent issued to Phinneas Banning in 1880. In the case of *People* v. *Banning Co.,* 166 Cal. 630 [138 Pac. 100], the very patent to tide-lands situated in survey No. 57, upon which the appellant in this case relies, was declared to be void. The court there said: "The land involved is what is known as tide land location No. 57, being the same location mentioned in the opinion in the case of *People* v. *California Fish Co.,* 166 Cal. 576 [138 Pac. 79]. That opinion . . . covers all the points involved in the present case. The first payment upon the tide land location was made March 5, 1880. The certificate was issued April 10, 1880, and the patent was issued December 16, 1881, to Phinneas Banning. The land all lies within two miles of the town of Wilmington as incorporated by the Act of 1872, and under the principles stated in *People* v. *California Fish*

*Co.,* aforesaid, the patent is void, and all claims of any of the defendants thereunder are invalid.''

The appellant's claim to title by acquiescence is not supported by the evidence. The mere construction and maintenance of an intervening fence is not sufficient upon which to base a claim of title by agreement or acquiescence. (*Staniford* v. *Trombly,* 181 Cal. 372 [186 Pac. 599]; *Dauberman* v. *Grant,* 198 Cal. 586, 592 [48 A. L. R. 1244, 246 Pac. 319]; *Wilder* v. *Nicholaus,* 50 Cal. App. 776 [195 Pac. 1068].) It is only when the owners of contiguous tracts of lands, who are holding under color of title are uncertain as to the real boundary line which separates their respective properties, by mutual agreement, either express or implied, consent to accept a specified line as the true boundary, and thenceforth occupy and use their respective properties in accordance therewith for a considerable length of time, that the contracting parties and their privies in title will be estopped from repudiating the agreed boundary line. (4 Cal. Jur. 432, secs. 56–59; 4 R. C. L. 126, secs. 66–71; 4 Thompson on R. P., 202, sec. 3110 et seq.) In the present case there was neither an express nor an implied agreement as to a party line.

The chief contention of appellant is that she acquired title to the land in controversy by means of adverse possession. Upon this subject a score of witnesses were called on either side. The evidence was conflicting. Aside from the payment of taxes, the appellant relies solely upon her proof of an alleged inclosure of the tract in question with a substantial fence in compliance with subdivision two of section 323 of the Code of Civil Procedure. None of the other elements constituting adverse possession are relied upon. The record is devoid of testimony indicating that the tract in question was ever actually occupied by the appellant or her predecessors, or that it was cultivated, improved, or used by them for grazing purposes or otherwise. The court found that the appellant had paid all taxes which had been assessed against the land for the required statutory period. The court also found that it was not true that said land or any part thereof had been inclosed with substantial fences; and that it was not true that substantial fences in conjunction with the waters of the bay of Wil-

mington or of the bay of San Pedro at high tide or otherwise furnished an inclosure of said premises such as is required by the statute. Upon the contrary, it was found that a "partial enclosure with substantial fence continued only from about April, 1904, to the early part of 1905." The court thereupon concluded that appellant had acquired no title to said property by virtue of adverse possession.

The question of what constitutes a "substantial enclosure," such as is required by section 323 of the Code of Civil Procedure, in order to establish adverse possession is purely a question of fact to be determined by the court. (*Jones* v. *Hodges,* 146 Cal. 160 [29 Pac. 869]; *Goodwin* v. *McCabe,* 75 Cal. 584 [17 Pac. 705]; 1 Cal. Jur. 530, sec. 26.) The burden is upon the one who asserts possession adversely to prove his claim by clear and positive evidence. (1 Cal. Jur. 636, sec. 95.) It necessarily follows that the findings of the court as to adverse possession will be upheld on appeal, where they are supported by substantial evidence. The appellant contends that in 1904 she constructed a substantial fence about the premises in question upon the northern and western sides thereof, which fence extended to the line of high tide at the margin of a deep and impassable slough upon the southerly and easterly boundaries, being a part of the inner basin of the San Pedro Bay, and thus completed a substantial inclosure. It does satisfactorily appear that appellant's predecessor in title did in fact build a fence of posts and wire about part of this tract in controversy, extending it approximately to the high tide mark along the waterfront of the bay, but that the fence soon became dilapidated and was never kept in repair so that it would serve to turn stock or protect the premises. At low tide this fence left unenclosed and open to trespassing stock a strip of land variously estimated at from 100 to 300 feet in width, solid enough for vehicles or stock to travel over, which they frequently did. After the construction of this fence there was apparently no effort made to keep it in repair. It deteriorated rapidly. Along the line of fence numerous breaches occurred. The posts toppled over and the wires fell. Many of the posts were hauled away by trespassers. Through these broken spaces in the line of fence teams entered the premises in search of driftwood and for

the purpose of digging clams. The witness Opp testified: "I observed the condition of the fence from the time I went there up to that time (1909); from the cross-fence east there were a good many breaks, a good many gaps, where the wires were broken down and the posts bent over; the wires were lying on the ground, and some of the posts were gone. . . . Most of the wires were more or less down all along, but there were some . . . at the west end toward the cross-fence which were in good condition a little longer." Mr. Hughes testified: "In 1906 and 1907, there were numerous breaks through the fence; it was not continuous (between the cross-fence and Vermont avenue). I went through a place . . . where a long stretch of the fence had been removed." Mr. Carson said: "I observed the condition of the fence around the bay. It began to fall soon after it was built." Mr. Call testified that Johnson, who built the fence, told him "it started to go down right after it was built; . . . that people (seeking firewood) broke through the fence . . . for driftwood; that if there wasn't enough driftwood they took the fence posts; that it was practically all down within two years from the time it was built." Mr. Brazee testified: "In two or three places the fence was wrecked; later the vandals wrecked some more; they would open it up along through the west edge bringing in driftwood; the longer the fence remained there the more it was being destroyed. I remember some Mexicans digging out the posts and loading them on their wagons." Mr. Mulherron testified: "I had two blocks of that fence removed. . . . We rolled it up and left it out on the road. That fence was never restored."

A dozen other witnesses testified to the dilapidated condition of the fence. All agreed that the breaches were never repaired. ▮▮▮ There was an abundance of evidence to support the court's findings to the effect that the fence did not constitute a substantial inclosure. The margin of the bay to the high water mark to which the fence was originally extended did not serve as a "natural barrier" which would prevent trespassing of stock. ▮▮▮ It is true that natural barriers may be utilized in conjunction with artificially constructed fences to constitute a substantial inclosure, but in the case of *Mountain Club* v. *Pinney*, 67 Cal. App. 225 [227 Pac. 630], it is said: That in order to become effective

such natural barriers must be sufficient to turn stock. In the case of *Borel* v. *Rollins,* 30 Cal. 408, it is held that in the absence of actual occupancy by a claimant a fence is insufficient which is neither substantial in its character nor kept in reasonable repair. Since title by adverse possession implies that the real owner has been ousted and has forfeited his title by laches, it follows that the claimant must establish his title by proof of strict compliance with the statute. His possession must be shown to have been open, notorious, continuous, and hostile, not only to the real owners, but also to the entire world for the full statutory period. (1 R. C. L. 685, sec. 1.) Where the claimant does not actually occupy the premises, but relies solely upon the maintenance of a substantial inclosure, a strict compliance of the statute in this regard should be required. His acts of ownership should be so open and apparent as to leave no reasonable question as to his hostile claim of title. To apply the common figure of speech, his inclosure becomes his rampart for the protection of his fortress. So long as his inclosure is maintained substantially intact, he continues to "fly the flag" of adverse title. (1 R. C. L. 698, sec. 11.) But when the inclosure deteriorates and becomes a mere inadequate makeshift, with no attempt to repair broken, dilapidated, or missing portions, through the breaches of which stock and vehicles may freely pass, the flag will be deemed to have been hauled down and the adverse claim abandoned. In the case of *Stephens* v. *Leach,* 19 Pa. St. 262, holding that an adverse claim of ownership had been abandoned, the court said: "Did he keep his flag flying, and present a hostile front? . . . Adverse possession ought to be such as to challenge all the world; but when an occupant evacuates the premises and suffers the enclosure to go to wreck, he hauls down his colors and his challenge is withdrawn."

In support of her claim of the adequacy of her inclosure, the appellant relies upon certain cases which may easily be distinguished from the facts of the present case. In *Baldwin* v. *Durfee,* 116 Cal. 625 [48 Pac. 724], it is said: "This claim (of adverse possession) is abundantly established by the evidence, unless the fact that during flood times in the winter season certain portions of the enclosure were

washed away and destroyed changes the legal aspect of the case. These disasters to the enclosure occurred but seldom, and were repaired within a reasonable time in each instance. . . . It is asserted that the enclosure must stand continuously and uninterruptedly for the term of five years. In a general sense this is true; but a mere temporary destruction of portions of the enclosure by fire or flood does not defeat the statute of limitations." In the case of *Andrus* v. *Smith*, 133 Cal. 78 [65 Pac. 320], the following language is used: "There is evidence that the plaintiff . . . kept up the fence surrounding it (the premises) . . . that he employed a carpenter to keep the fence in repair; that the fence was kept up most of the time; but at times was destroyed by the schoolboys pulling off pickets and breaking the boards." The evidence in that case showed that the boards and pickets did not remain off the fence for any considerable length of time, but upon the contrary, the caretaker promptly repaired it whenever he found it out of order. In the case of *Jones* v. *Hodges*, 146 Cal. 160 [79 Pac. 869], it was held that the fence which inclosed the premises in controversy was sufficient to "turn a cow or horse unless they would run into it in madness," and that it was kept intact except "when rails were temporarily off the fence." Adverse possession in the two cases last mentioned was not based solely upon evidence of the maintenance of a substantial inclosure, but there was evidence of the use of the premises by the claimant for grazing purposes and for cultivation, together with the presence of other improvements, and actual possession of the premises.

For the foregoing reasons the judgment is affirmed.

Hart, J., concurred.